(No. 13367.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WALTER COLVIN *et al.* Plaintiffs in Error.

*Opinion filed June 16, 1920—Rehearing denied October 18, 1920.*

1. CRIMINAL LAW—*when refusal to strike out testimony of admissions is not error.* Refusal of the trial court to strike out testimony as to admissions of guilt is not error, where the defendants' testimony that the admissions were made under duress is contradicted and the whole question is submitted to the jury under instructions requested by the defendants.

2. SAME—*when conclusion of jury as to credibility of witnesses cannot be interfered with.* Where the issue depends upon the credibility of the witnesses, the conclusion of the jury, when approved by the trial judge, cannot be interfered with, unless some fact or circumstance appears in the evidence from which the court can say that some witnesses have been truthful and worthy of credit while others have been untruthful or mistaken.

3. SAME—*newly discovered evidence must be of such character as to change result if a new trial is granted.* A new trial will be granted for newly discovered evidence only where it is shown that the evidence could not have been produced on the trial by the use of reasonable diligence and is not merely cumulative; and even if the question of reasonable diligence is waived and the evidence is not cumulative, it must appear that it is of such a nature that it will probably change the result if a new trial is granted.

4. SAME—*when it cannot be said that newly discovered evidence will change result.* Where newly discovered evidence set forth in affidavits on a motion for a new trial is inconsistent with uncontradicted physical facts which the jury cannot disregard, it cannot be said that the result of a new trial will be different if the newly discovered evidence is admitted.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOSEPH SABATH, Judge, presiding.

F. L. BARNETT, and BENJAMIN POLLARD, (JAMES J. BARBOUR, of counsel,) for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, ALBERT D. RODENBERG, EDWARD E. WILSON, and JAMES C. O'BRIEN, for the People.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

On July 28, 1919, race riots between the white and the black people were in progress in the vicinity of Thirty-sixth and State streets, in what is called the "black belt," in Chicago. At about 4:30 in the afternoon of that day Morris Lazzeroni, a banana peddler, who was driving his horse and wagon south on State street, was murdered near No. 3626 by stabbing him in the abdomen in two places, cutting into his stomach through the center to the breast bone, and he was also cut on the right arm, right wrist and right thigh and on the corner of his mouth. He fell from his wagon, and at about 4:50 a police wagon came to the place and took his dead body to an undertaker's place. The coroner's physician found two deep incised wounds in the abdomen and one deep incised wound in the right thigh. The plaintiffs in error, Walter Colvin and Charles Johnson, together with John Green and Frank Coachman, were indicted for the murder. The plaintiffs in error were tried and found guilty and their punishment was fixed at life imprisonment, with a finding of the jury that Johnson was eighteen years of age and Colvin sixteen years of age.

No error was committed on the trial. There was testimony that the defendants admitted their participation in the murder to an assistant State's attorney and police officers in the presence of two other witnesses, and that Colvin described the manner in which the murder was committed. This evidence was received without objection, but at the close of the evidence for the People a motion was made to strike it out for the reason that the statements were made under duress. There had been some cross-examination of the witnesses for the People as to whether there were any threats, misconduct or inducements to obtain the admissions from the defendants and all such conduct had been denied, so that there was no evidence which, if true, tended to prove

duress, and the motion was denied. At the conclusion of all the evidence the motion to strike out all testimony relating to statements of the defendants on the ground that they were made under duress was renewed and again denied. The defendant Johnson testified that he was called vile names; that the police threatened to beat him to death if he did not tell the truth and confess that he committed the murder; that he was struck on the head with a club, beaten with clubs, struck in the mouth, and otherwise mistreated until he admitted that he took part in the murder. Colvin testified that he was told if he did not say that he killed the man it would go hard with him; that he was struck in the face, choked, locked up and kept on bread and water three days and nights. If this testimony, or a considerable part of it, was true a gross outrage was committed, which not only deserves the severest condemnation, but which would exclude as evidence any admissions obtained by such means. The claim that there had been any improper conduct to obtain the admissions had, however, been contradicted on cross-examination of witnesses testifying to admissions, and although Johnson testified that he was beaten with clubs, there was no evidence whatever of any physical signs of injury which might have been expected, and it is evident that the court did not believe the defendants. The question, however, was afterward submitted to the jury on instructions requested by the defendants. In one instruction the court advised the jury that an admission, to be admissible in any criminal case, must have been made freely and voluntarily by the defendants; that it must not have been induced by any person or persons by the remotest fear or injury or duress or the slight hope of benefit or reward of anything whatsoever and must have been freely and voluntarily made, otherwise the jury should disregard the alleged admission on the part of the defendants. These rules were amplified in another instruction, in which the jury were told that it was their right and duty to determine for themselves

whether the alleged admission or admissions of the defendants, or either of them, were made freely and voluntarily, without any influence or hope or fear or violence, and that any, the slightest, menace or threat, or any hope aroused or encouraged by any of the officers that the prisoner's case would be lightened or more favorably dealt with if he would confess, was enough to exclude the admission or admissions, if any, thereby obtained, with much more to the same effect. There is, of course, no way of knowing whether the jury disregarded the admissions and based their verdict solely on the direct evidence or not, but there is nothing in the record from which it can be said that their conclusion was wrong if they regarded the admissions as freely and voluntarily made.

The refusal of the court to strike out the testimony of admissions is the only alleged error occurring in the trial and there is no error assigned upon the giving or refusal of instructions, none of which are abstracted, the above mentioned instructions being taken from the record.

One error assigned on the sufficiency of the evidence is that the record contains no evidence that the deceased, Lazzeroni, who was murdered, was the Morris Lazzeroni mentioned in the indictment. The police officer who found the body lying in the street where the murdered man fell from his wagon learned his name from receipts in his clothing. The body was taken to the home of Morris Lazzeroni at 2012 East Eighty-third street on July 29 and was there identified by his daughter, Jennie Lazzeroni, and the argument seems to be that he was not proved to be Morris Lazzeroni because she called him "Mr. Lazzeroni," which is trifling with evidence. An inquest on the body was held by the coroner, and although the deceased was sometimes called Lazzeroni, without his full name, there is not a particle of doubt of identity.

Concerning the commission of the crime, Dollie Herman, who kept the Alamo laundry, at 3626 State street, tes-

tified that she was in her laundry office looking out of the window and saw the peddler's wagon in the street about twenty feet from her building; that there were four boys on the wagon attacking the peddler; that Colvin was standing on the hub of the left front wheel, facing her, and was cutting the peddler on the shoulder or arm; that Johnson was cutting him in the body in front and the other boys were back in the wagon; that she turned away from the horror of the thing and did not see the peddler fall from the wagon. She recognized and identified the defendants. The admissions of the defendant Colvin at the police station were also testified to by her and by Laura Dixon, who was called to the police station on account of the killing of Eugene Temple at about the same time in front of her home, at 3640 State street.

The credibility of Dollie Herman is attacked on the alleged ground that at the coroner's inquest she testified that Johnson was not engaged in the murder of Lazzeroni and she did not then identify him as having anything to do with it. The coroner held an inquest at the same time on two bodies,—one of them that of Eugene Temple, who was killed about the same time and near the same place as Lazzeroni, and the other upon the body of Lazzeroni. On the trial there was a considerable cross-examination of Dollie Herman as to whether she did not testify to certain things at the coroner's inquest and the cross-examination is not easily understood, but she constantly denied that she did not then identify Johnson as engaged in the murder, and on the motion for a new trial the whole of her testimony was introduced. She was examined at very great length concerning the killing of Eugene Temple, and following that lengthy examination she was asked if she saw another stabbing or killing of another peddler, named Lazzeroni, and answered that she did and that she saw the boys then present at such killing. Colvin, Coachman and Green stood up successively and were identified by her. She wanted to get

home and the coroner promised to get through with her as quickly as possible, and the coroner and attorneys were all asking questions mixing up and confusing the two murders. She said at one time that she did not remember seeing Johnson in that at all, but evidently referred to the murder of Temple, and being asked as to the ones that killed Lazzeroni, directly identified Johnson. There is no sufficient reason to suppose that the testimony of Dollie Herman was changed in any particular. She testified that she was about twenty feet from the scene of the horrible tragedy, and the appearance of the actors would naturally make a most vivid impression upon her mind and memory.

Each defendant produced a number of witnesses who testified that he was not at the place where the murder was committed. Witnesses for Colvin testified that he was pitching horse shoes all day until night, and those testifying for Johnson said that he was asleep at home from about noon until supper time, after five o'clock, when he was sent after bread. It is evident that the issue depended upon the credibility of the witnesses, which is committed to the jury, and when the conclusion is approved by the trial judge it cannot be interfered with unless some fact or circumstance appears in the evidence from which the court can say that some witnesses have been truthful and worthy of credit while others have been untruthful or mistaken.

On the motion for a new trial the court was presented with three affidavits of newly discovered evidence and an affidavit of one of the attorneys as to the diligence used to procure the evidence, and the persons making the affidavits also appeared in court and were sworn and gave testimony to the same effect as their affidavits. The defendants were represented by five attorneys at the trial and only one of them made an affidavit showing any diligence to discover evidence. His affidavit stated that he was leading counsel and was unable to procure any witnesses who saw the assault although he interviewed six named persons in the

block, none of whom witnessed the assault or knew of anyone who did. One affidavit was by George Davis, a Pullman car porter, who stated that he first learned on September 26 that two boys under twenty-one years of age had been convicted; that he was on State street on July 28, between four and five in the afternoon, and saw Lazzeroni in his peddler's wagon proceeding slowly down the street and saw a black man, heavy-built, about five feet six, of 150 or 160 pounds' weight and thirty-five or forty years old, jump on the wagon and without provocation strike the deceased with a knife two or three times and then jump off the wagon and escape in the crowd; that the horse walked slowly south and Lazzeroni fell from the wagon on State street; that the man was neither Colvin nor Johnson, and he did not know they were indicted nor to be tried and was out of the city most of the time and did not know until after the verdict that anyone had been charged with murder. Mamie Murray in her affidavit said that she lived at 3519 Wabash avenue; that she saw the tragedy and was about twenty feet away from Lazzeroni when he was stabbed and that it was by the person stated in the affidavit of Davis; that Johnson and Colvin were not the assailants and no boy or set of boys committed the act, and that she did not know of any arrest or trial until she read of the verdict in the newspaper, and then she sought out the attorney who made the affidavit. Dorothy Caswell stated in her affidavit that she lived at 3540 Calumet avenue and was within fifteen feet of the wagon, and she described the killing and the assailant in the same manner as George Davis and Mamie Murray.

The rule in this State has always been that a new trial will only be granted for newly discovered evidence where it is shown that it could not have been produced on the trial by the use of reasonable diligence, and if the evidence is cumulative in character it must be conclusive, necessarily

leading to a change in the result. (*Crozier* v. *Cooper,* 14 Ill. 139; *Martin* v. *Ehrenfels,* 24 id. 187; *Petefish, Skiles & Co.* v. *Watkins,* 124 id. 384.) Only one of the attorneys for the defendants was shown to have exercised any diligence to ascertain the existence of the evidence, but if that question is waived and the evidence is not cumulative in character it must appear that it is of such a nature that it will probably change the result if a new trial is granted. Applying that rule, it does not appear that the result would be different if the newly discovered evidence were admitted, because the facts set forth in the affidavits are inconsistent with uncontradicted physical facts, which the jury could not disregard. The alleged newly discovered evidence by persons within fifteen or twenty feet of the wagon was that a full-grown black man thirty-five or forty years of age jumped on the wagon and struck the deceased with a knife two or three times and then jumped off, while the undisputed physical facts were that there were abrasions of the forehead, right eye, right temple and right ear, two deep incised wounds in the abdomen, a deep incised wound in the right thigh and cuts on the right arm and the right wrist. The wounds made with knives corresponded with the evidence given on the trial and could not have been inflicted as described in the affidavits.

There being no error committed on the trial and no sufficient grounds for granting a new trial on account of newly discovered evidence, and the question submitted to the jury being dependent upon the credibility of witnesses, without any apparently controlling fact or circumstance leading to a different result, the judgment will be affirmed.

*Judgment affirmed.*